FILED '07 MAR 08 08:33 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| STEVE HINDMAN, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 03-293-TC |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| ROBERT LAMPERT, | ) | |
| | ) | |
| Respondent. | ) | |

COFFIN, Magistrate Judge.

Before the court is petitioner's Amended Petition for Writ of Habeas Corpus (#56). For the reasons that follow, the court should deny the writ and dismiss the case.

BACKGROUND

Petitioner was convicted of first-degree burglary, second-degree assault, and third-degree assault. The record discloses the following facts leading up to the conviction. An intruder broke into the bedroom of two young children, hit both in the face, and told them to leave with him. Tr. 11-13, 123. The children's father, Riley, heard them crying, went downstairs and saw a man standing outside the children's bedroom. Riley (who enjoys 20-20 vision) stood approximately 12 feet away and observed the intruder in good light. Riley described the intruder to police as tall and slender, with dark hair and a mustache, wearing faded black jeans and a red flannel shirt. Tr. 47.

Petitioner lived with his parents a few blocks away from the Riley house. Police officers assembled a photo montage that included a mugshot of petitioner that had been taken six months earlier. Riley reported that he got an "extremely" good look at petitioner and selected him from the photo montage and stated that he was "99.99 percent" certain that petitioner was the intruder. Tr. 114-19; Motions Tr. at 31-32, 38, 40. The following day police retrieved a beer bottle and cap from the Riley yard with a Circle K logo on the cap that contained DNA consistent with petitioner's. Tr. 29-30, 77, 126.

When interviewed approximately four hours after the assault, petitioner was wearing a red flannel shirt and jeans. At trial, he testified that earlier that night he had been wearing dark jeans. Tr. 50-54, 62. Petitioner testified that, an hour before the assault, he had walked to Circle K and purchased a beer the same size and brand as that found in the Riley yard. Tr. 146-48. A Circle K employee confirmed that a man fitting petitioner's description made the beer purchase. Tr. 89.

Petitioner's parents were interviewed by police approximately four hours after the assault. Tr. 50-52. When asked whether they knew petitioner's whereabouts at the time of the assault, they reported that they were sleeping and did not know. Tr. 54, 68-70. At trial, petitioner wished to argue that he was home at the time of the assault. Tr. 146-48. Before petitioner's parents were to testify, the prosecutor was apprised that the parents' planned

2 - FINDINGS AND RECOMMENDATION

testimony about their knowledge of petitioner's whereabouts on the night of the assault would differ from their earlier statements to the police. The prosecutor advised the parents that they would be prosecuted if they perjured themselves. Petitioner's defense attorney, after having subpoenaed petitioner's parents, advised them of their right to invoke their Fifth Amendment right to refuse to testify. At trial, petitioner's parents invoked their right not to testify on the grounds that their statements might incriminate them. Tr. 141, 144.

Petitioner was convicted after a bench trial. He has exhausted direct appeals and collateral remedies. Resp. Ex. 104-08, 111, 135-45. He now asks the court to issue a writ of habeas corpus on the basis that he received ineffective assistance of counsel at trial and on appeal, in violation of the Sixth Amendment.

Petitioner first asserts that defense counsel created a conflict of interest by advising petitioner's parents that they may invoke their Fifth Amendment right to refuse to testify. Second, petitioner contends that defense counsel erred by failing to move the trial court to compel the parents' alibi testimony after they invoked the privilege. Third, petitioner asserts that his attorney on appeal was inadequate for failing to assign error to the trial court's denial of his motion to suppress the pretrial identification on the basis that the photographic line up was overly suggestive. For the reasons that follow, the court should deny relief on all claims and dismiss the case.

3 - FINDINGS AND RECOMMENDATION

## ANALYSIS

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant habeas relief regarding any claim "adjudicated on the merits" in a state court unless the state court ruling "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The Supreme Court has explained that a state court decision is "contrary to" federal law under the AEDPA if it either fails to apply the correct Supreme Court authority or applies the correct controlling authority to a case involving "materially indistinguishable" facts but reaches a different result. Williams v. Taylor, 529 U.S. 362, 405-07, 413 (2000). Similarly, a state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citations omitted).

"In Williams and in subsequent decisions the Supreme Court has repeatedly emphasized that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003) (quoting Williams, 529 U.S. at 410). Thus, "[t]he petitioner must demonstrate not only that the state court's application of governing federal law was erroneous, but also that it was objectively unreasonable." Ramirez v. Castro, 365 F.3d 755, 762 (2004) (citing Andrade, 538 U.S. at 75); see also

4 - FINDINGS AND RECOMMENDATION

Penry v. Johnson, 532 U.S. 782, 793 (2001); Clark, 331 F.3d at 1068-69 (discussing Andrade and the appropriate standard of review).

Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated in the three respects noted above. I begin with petitioner's assertion that defense counsel established an actual conflict of interest when he advised petitioner's parents of their right to refuse to testify, in order to avoid the risk of perjuring themselves by providing false alibi testimony for their son.

As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). However, when assistance of counsel has been denied entirely or during a critical stage of the proceeding, the likelihood that the verdict was affected is high; thus, prejudice is presumed and need not be demonstrated. United States v. Cronic, 466 U.S. 648, 658-59 (1984).

The Supreme Court has held that, in certain cases where the petitioner's "attorney actively represented conflicting interests," the ability of the accused to receive a fair trial may be so compromised that the effect is tantamount to denial of counsel. See Mickens v. Taylor, 535 U.S. 162, 166 (2002) (citing cases). Where a petitioner raised no objection at trial regarding an alleged conflict, and "shows that a conflict of interest actually affected the adequacy of his representation," the petitioner demonstrates ineffective

5 - FINDINGS AND RECOMMENDATION

assistance and "need not demonstrate prejudice in order to obtain relief." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 349-50 (1980). Under such circumstances, "prejudice will be presumed <u>only</u> if the conflict has <u>significantly affected</u> counsel's performance-thereby rendering the verdict unreliable." <u>Mickens</u>, 535 U.S. at 173 (emphasis added). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." <u>Id.</u> at 172 n.5, <u>accord id.</u> at 171 ("we think 'an actual conflict of interest' mean[s] precisely a conflict that affected counsel's performance-as opposed to a mere theoretical division of loyalties.").

<u>Mickens v. Taylor</u> provides the most recent and detailed explanation of the types of "actual conflicts" for which prejudice may be presumed. After clarifying its conflict precedent, the <u>Mickens</u> Court sharpened the boundaries of its application. The Court first discussed three seminal Supreme Court conflict cases: <u>Holloway v. Arkansas</u>, 435 U.S. 475 (1978); <u>Cuyler</u>, 446 U.S. at 346-49; and <u>Wood v. Georgia</u>, 450 U.S. 261 (1981). Each case in which a conflict had been identified, the Court noted, involved the issue of adequacy of counsel in the context of <u>multiple concurrent representation</u>. The Court explained, "Both <u>Sullivan</u> itself and <u>Holloway</u> stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties." <u>Mickens</u>, 535 U.S. at 175 (internal citations omitted). The Court then cautioned against expanding the holding of <u>Cuyler</u> to address other types of

attorney ethical violations, noting that the jurisprudence only addresses joint representation. Id.

Subsequently, the Ninth Circuit has stressed that Mickens permits the existence of a conflict to "stand in" for a showing of prejudice only where the actual conflict is tantamount to a denial of counsel. Earp v. Ornoski, 431 F.3d 1158, 1182-84 (2005), cert. denied, 126 S.Ct. 2295 (2006). Emphasizing the limitations that the Supreme Court placed on its own holding, the Ninth Circuit explained,

> "the Mickens Court added an entire section to address the limited scope of its holding, and to explicitly cabin its conflict jurisprudence despite its expansive application by lower courts. 535 U.S. at 174-76. The Court noted that circuit courts "have applied Sullivan 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' " invoking it in cases involving interests of former clients, interests implicating counsel's personal or financial interest, interests inherent in romantic relationships with opposing counsel, and interests implicated by counsel's future or present employment with opposing counsel. Id. at 174 (citation omitted). While acknowledging this expansion, the Court cautioned that its own conflict jurisprudence had not yet reached beyond joint representation: 'the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application...'. The Court propounded that the conflict inquiry does not, and should not, entail weighing of professional ethical duties, and that the Sullivan exception is not intended to enforce and encourage compliance with codes of conduct. . . . The Mickens Court specifically and explicitly concluded that Sullivan was limited to joint representation, and that any extension of Sullivan outside of the joint representation context remained, 'as far as the jurisprudence of [the Supreme Court was] concerned, an open question.'" Earp, 431 F.3d at 1184-85.

The petitioner bears the burden of proof to show an asserted conflict of interest by a preponderance of the evidence. E.g., Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001) (en banc)

7 - FINDINGS AND RECOMMENDATION

(petitioner must prove by preponderance of the evidence that actual conflict adversely affected attorney's performance), aff'd, 535 U.S. 162 (2002); see also Cuyler, 446 U.S. at 348 ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). "[T]he burden of proof cannot be met by speculative assertions of bias or prejudice." Triana v. United States, 205 F.3d 36, 41 (2000).

In petitioner's view, his defense counsel developed an actual conflict of interest that created the presumption of prejudice when he told the parents that they were entitled to invoke the Fifth Amendment privilege after the prosecutor apprised them of the consequences of perjury. In response to petitioner's claim that petitioner's counsel threatened the parents into invoking their right to refuse to testify, the post-conviction court noted "if a person lies under oath, such person can be charged with perjury," and found, "petitioner's parents were obviously concerned enough to exercise their constitutional rights against self-incrimination." The court further explained, in the context of evaluating petitioner's claim that his trial counsel ineffectively refused to compel the parents to testify (see discussion infra), that advising the parents that "an option included utilization of their right against self incrimination," did not constitute inadequate assistance. The post-conviction court's determination does not constitute an unreasonable

8 - FINDINGS AND RECOMMENDATION

application of the governing standards. To the contrary, it appears eminently reasonable and correct.

As an initial matter it is difficult to assert that defense counsel "actively represented" petitioner's parents while also representing his client, as relevant case law requires. The bare record discloses: (1) defense counsel subpoenaed petitioner's parents, (2) realized that they intended to present testimony inconsistent with their earlier claim that the did not know petitioner's whereabouts at the time in question, (3) advised them that their testimony had to be truthful, and that untruthful testimony could subject them to criminal investigation, and (4) they were entitled to invoke their Fifth Amendment right to refuse to testify. The record does not contain any indication that either petitioner's attorney or parents understood themselves to have entered an attorney-client relationship under Oregon law. See In re Conduct of Wyllie, 19 P.3d 338, 344 (Or. 2001) ("A lawyer-client relationship may be found based on the putative client's objectively reasonable belief that a relationship has been established [and] the putative client's subjective belief must be accompanied by evidence that the lawyer understood or should have understood that the relationship existed.").

Further, as the state notes, legal standards addressing an attorney's ability to advise nonclients of the Fifth Amendment privilege specifically allow for the actions of petitioner's counsel. The principle is distilled in Restatement 3rd of the Law Governing Lawyers:  "A lawyer for a party may properly inform a nonclient

9 - FINDINGS AND RECOMMENDATION

witness of . . . the privilege against self-incrimination . . . but the lawyer may not attempt to unlawfully persuade the nonclient witness not to testify on those or other grounds." Restatement 3rd of the Law Governing Lawyers, § 116 Comment d. Though obliged to represent his client with diligence, Or. R. Prof. Conduct 1.3, petitioner's counsel was working under ethical rules that also barred him from presenting false evidence to the court, Or. R. Prof. Conduct 3.4. Under these circumstances, it is far from clear that an ethical breach occurred, let alone an conflict tantamount to denial of counsel at a critical stage in the proceeding. Petitioner does not adduce any legal authority to show that, under circumstances present in this case, the actions of defense counsel developed an "actual conflict" of interest that would trigger a presumption of prejudice under the relevant Sixth Amendment case law.

Moreover, whether or not an attorney-client relationship is required to demonstrate that an attorney actively represented competing interests, I cannot hold that defense counsel's decision to alert petitioner's parents to their Fifth Amendment privilege "adversely affected" counsel's performance. Defense counsel discharged his professional duty to safeguard against the introduction of evidence that, in his informed view, would subject the witnesses to perjury prosecution and could ultimately hinder his client's case. Ultimately, it is the action of the parents that petitioner now contests. The parents appeared under subpoena and could have decided to present the alibi testimony that they had planned to provide,

10 - FINDINGS AND RECOMMENDATION

rather than invoke their right to refuse to testify. Defense counsel worked within the limits of his resources to address the parents' testimony in defending his client as the trial continued to unfold.

Because no "actual conflict" was present, a showing of prejudice would be required in order to justify habeas relief. Strickland, 466 U.S. at 687. Petitioner has failed to demonstrate that his trial counsel's actions resulted in prejudice. As the state explains, the evidence against petitioner at trial was substantial. Riley, who was able to see the intruder in good light from a distance of 10 to 12 feet, provided a precise description of petitioner to police, Tr. 119-20, and identified petitioner as the assailant from a photographic line up. The clothes that petitioner admitted wearing on the night of the assault were consistent with those described by Riley. Tr 52-54, 153. An employee at the Circle K testified that petitioner purchased beer that night dressed in the same type of clothes that Riley noticed on the assailant, Tr. 89, and petitioner's DNA is consistent with DNA discovered on a beer bottle of the same brand petitioner purchased and recovered the next day in the Riley yard, Tr. 29. "[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." Mickens, 535 U.S. at 166. In sum, petitioner's first claim is not well-taken, and the court should reject it.

Petitioner next argues that his trial counsel provided ineffective assistance by failing to compel alibi testimony from petitioner's parents. Again, in order to prove the ineffective

11 - FINDINGS AND RECOMMENDATION

assistance claim, petitioner must prove that (1) "counsel's performance was deficient," marked by "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "the deficient performance prejudiced the defense" because the "errors were so serious as to deprive the defendant of a fair trial . . . whose result is reliable." Strickland, 466 U.S. at 687. Petitioner bears the burden of proving, by a preponderance of the evidence, the underlying facts supporting the ineffective assistance of counsel claim. See ORS 138.620(2). Moreover, 28 U.S.C. § 2254(d) creates a presumption that state court findings of fact, after a hearing on the merits, are correct.

Petitioner has not shown that the state post-conviction court decision was an unreasonable application of the Strickland standard, as required under 28 U.S.C. § 2254(d). The post-conviction court rejected petitioner's argument, explaining that the predicate action of "apparently advis[ing] the parents that an option included utilization of their right against self-incrimination. . . did not constitute inadequate assistance of counsel through violation of defending his client's interests." Resp. Ex. 134 at 4. As explained above, it was not error, much less "unreasonable" error, for the post-conviction court to make that conclusion. For largely the same reasons, defense counsel's failure to move to compel their testimony did not constitute ineffective assistance of counsel. After subpoenaing petitioner's parents, defense counsel came to understand in what respects petitioner's parents' testimony would differ from

12 - FINDINGS AND RECOMMENDATION

their earlier statements to the police, had spoken with petitioner's parents about perjury, and advised them that invoking the privilege was an option. Faced with the parents' invocation, defense counsel's decision not to move to compel their alibi testimony (the very evidence that occasioned defense counsel's concern that he might be eliciting perjured testimony), did not constitute ineffective assistance. Moreover, defense counsel was thoroughly versed in the range and quality of evidence against petitioner, including petitioners' parents earlier inability to account for their son, who was living at home the night of the assault. That knowledge informed defense counsel's evaluation of whether the parents' testimony might be perjurious and provided a rationale for a decision against compelling alibi testimony.

Furthermore, as the state correctly argues, "had counsel compelled petitioner's parents to testify, he risked having them provide testimony that was consistent with their previous statements to police and the other evidence developed in petitioner's case, which would have been even more damaging. . .". Response Br. at 18. Petitioner has not shown that the post-conviction court's conclusion was based on an unreasonable determination of the facts in light of the evidence before it. Thus, petitioner does not warrant relief on this ground.

Petitioner finally asserts that his appellate counsel provided ineffective assistance by failing to assign error to the trial court's denial of petitioner's motion to suppress a pretrial identification.

13 - FINDINGS AND RECOMMENDATION

In petitioner's view, the photo thrown-down that gave rise to the identification was unduly suggestive. The post-conviction court rejected petitioner's argument, explaining, "there [is] no showing that the identification procedure was illegal; petitioner's counsel did test the identification evidence . . . but the failure to pursue such considering the circumstances of the case did not constitute inadequate appellate representation." The court further explained that "there was no showing that the throw-down procedure was suggestive[.]"

Again, petitioner has not shown that the state post-conviction court decision was an unreasonable application of the Strickland standard, as required under 28 U.S.C. § 2254(d). A pretrial identification violates due process where an identification procedure is so suggestive as to produce a substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 197 (1972). Even if an identification procedure is suggestive, it will be upheld where there are indicia of reliability, such as the witness's opportunity to view the participants in the crime and whether attention was paid, the accuracy of prior descriptions of the accused, the level of certainty that the identifying party demonstrates when confronted with the person who is identified, and the length of time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Here, petitioner asserts that the throwdown was unduly suggestive because an officer who assisted in preparing a photo montage had been told that Riley described the assailant as wearing

14 - FINDINGS AND RECOMMENDATION

a "red and white striped, flannel type shirt," Motions Tr. at 24, and the photo of petitioner selected for the montage featured petitioner wearing a striped shirt. The photo was a mugshot of petitioner taken six months prior to the crime in question. Pet. Ex. 9; Tr. 47. The five other photographs in the montage included individuals of similar body type and hair color.

However, even if that coincidence raised an inference of suggestibility, an evaluation of the totality of the circumstances indicates that the throwdown was legal. As noted above, Riley was able to get an "extremely good look" at the assailant from a distance of 10 to 12 feet in a lit area. Shortly after, he was able to provide a detailed description of the assailant to the police. When presented with the throwdown approximately nine hours after the assault, Riley identified petitioner as the intruder and stated his certainty reached 99.99%. Motions Tr. at 31-32. The trial court determined, based on the record, that "Riley got a good look at the suspect. The lighting was adequate. Suspect turned to look at him from a distance of approximately 10 to 12 feet. . . Riley, still fresh in his memory just a few hours later, identified him. There's nothing in my view that is unnecessarily suggestive." In sum, the post-conviction court did not employ an unreasonable application of the law in determining that failing to assign error to the suppression motion did not qualify as ineffective assistance.

## CONCLUSION

Petitioner's Amended Petition for Writ of Habeas Corpus (#56) should be denied. This proceeding should be dismissed.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issue and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this 8t day of March, 2007.

THOMAS M. COFFIN
United States Magistrate Judge